The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Opinion Number: _____**

**Filing Date:** March 16, 2023

**NO. S-1-SC-37698**

**IN THE MATTER OF**
**VICTOR R. MARSHALL,**
**An Attorney Suspended from**
**the Practice of Law in the**
**Courts of the State of**
**New Mexico**

Anne L. Taylor, Chief Disciplinary Counsel
Jane Gagne, Assistant Disciplinary Counsel
Albuquerque, NM

for the New Mexico Disciplinary Board


The Baker Law Group
Jeffrey L. Baker
Renni Zifferblatt
Albuquerque, NM

for Respondent

**OPINION**

**PER CURIAM.**

**I.    INTRODUCTION**

{1}    This Court suspended Respondent Victor Marshall indefinitely from the practice of law in New Mexico in accordance with Rule 17-206(A)(3) NMRA following his violations of Rules 16-301 NMRA, 16-802 NMRA, and 16-804(D) NMRA. The Disciplinary Counsel of the New Mexico Supreme Court alleged that Marshall did not abide by this Court's order and Rule 17-212 NMRA, prompting a Show Cause Hearing. During the hearing and in his briefing, Marshall did not contest Disciplinary Counsel's allegations, and his behavior during the Show Cause Hearing violated the standards of conduct before the Court. As a result, we held him in contempt both for the allegations against him brought by Disciplinary Counsel and for his behavior before this Court during the Show Cause Hearing. Consistent with our order of January 13, 2022, a precedential opinion filed with this opinion documents our analysis and the corresponding disposition concerning Disciplinary Council's allegations against Marshall. *See In re Victor R. Marshall* (*Marshall I*), 2023-NMSC-___, ___ P.3d ___, (S-1-SC-37698, Mar. 13, 2023).

{2}    One of the obligations imposed on Marshall by this Court due to his actions was to pay a $2,000 fine to the State Bar of New Mexico Client Protection Fund.

Today, we write here to explain our contempt ruling and to revisit our precedent setting a $1,000 limit to fines imposed for contempt. *See Seven Rivers Farm, Inc. v. Reynolds*, 1973-NMSC-039, ¶ 42, 84 N.M. 789, 508 P.2d 1276. We analyze our state's precedent, statutes, and relevant constitutional provisions to determine that this limit no longer applies.

## II.     BACKGROUND

### A.     Factual Background

{3}      Marshall originally appeared before this Court after the Disciplinary Board's hearing panel adopted the hearing committee's conclusions that Marshall violated Rules 16-301, 16-802, and 16-804(D) by making unsubstantiated statements about Judge James Wechsler in public pleadings. *See Marshall I*, 2023-NMSC-___, ¶¶ 8-9, ___ P.3d ___. After hearing the matter, we concluded Marshall had in fact made the unsubstantiated statements about Judge Weschler, and accordingly we suspended Marshall, for no less than one year but indefinitely, from practicing law. Due to his suspension, Marshall was required to comply with Rule 17-212. Rule 17-212(A) and (B) require that the suspended lawyer send letters to the lawyer's clients, relevant courts, and opposing counsel informing them of the lawyer's suspension. Rule 17-212(A) and (B) further require that the suspended lawyer's letters be on a form prescribed or approved by Disciplinary Counsel. Rule 17-212(C) prohibits

2

suspended lawyers from engaging in the practice of law. Finally, Rule 17-212(D) mandates that a suspended lawyer must file an affidavit of compliance with the New Mexico Supreme Court within ten days after the effective date of suspension.

{4} Marshall submitted an affidavit in an attempt to establish his compliance. However, Disciplinary Counsel found that the affidavit was deficient as follows: (1) the notices to the courts were not on the form prescribed by Disciplinary Counsel, (2) the affidavit contained no copies of letters to clients, and (3) the affidavit contained no copies of letters to opposing counsel. The notices asked the lower courts to stay proceedings, which, according to Disciplinary Counsel, "constitutes the practice of law, in direct violation of this Court's January 13, 2022, order suspending [Marshall] from the practice of law." Accordingly, Disciplinary Counsel filed a motion requesting this Court to enter an order for Marshall to show cause as to why he should not be held in contempt of Court for failing to comply with Rule 17-212.

{5} In responding to this Court's April 18, 2022, order to show cause, Marshall filed the response himself rather than through his counsel and did not contest the facts alleged by Disciplinary Counsel. Instead, Marshall argued that Disciplinary Counsel's motion was unconstitutional, that Disciplinary Counsel's motion was factually and legally deficient, and that his own actions were warranted because he

3

had an obligation to protect his clients. This Court scheduled a hearing on the matter for May 25, 2022.

{6} Disciplinary Counsel attended the hearing in person, and Marshall and his attorney Jeffrey Baker appeared at the hearing through video. The Court began the hearing by asking Baker to clarify his role in the proceedings. Confusion existed because Baker continued to represent Marshall, Baker attended the hearing and had not withdrawn as counsel, and yet Marshall purportedly acting pro se had filed multiple pleadings with the Court. Baker indicated that he still represented Marshall and that Marshall submitted pleadings to the Court because Marshall was "in the best position to be able to tell the Court what he did, when he did it, [and] why he did it" due to his personal knowledge of the situation. The Court informed Baker that one cannot be pro se and represented by counsel at the same time because the positions are incongruous. The Court further inquired as to whether Baker planned to advocate for his client during the hearing. Baker stated that he intended for his role during the hearing to be limited and intended to ask the Court for permission for Marshall to address the Court.

{7} The Court informed Marshall that he could present to the Court; however, because Marshall was not a licensed attorney at the time of the hearing, he would be required to make his presentation under oath. Marshall asked to confer with his

attorney and stated that the requirement was a "curveball" to his plan to present that day. The Court allowed a brief conference. Once the Court was back in session, Baker indicated that Marshall wanted to address the Court. The following exchange then occurred between Marshall and Chief Justice C. Shannon Bacon.

> **MARSHALL:** As we notified the Court Clerk earlier this week, I am the one who is going to be presenting. We received no objection from anyone. So, of course, I am prepared to address the Court's questions. Mr. Baker is not.

> **MARSHALL:** In addition, I believe that I actually am entitled to represent myself . . . and to speak in my own defense against the contempt charge. But the bottom line is, um, we can't proceed on thirty seconds notice under the Court's terms. We would need to adjourn, and I'll confer with my counsel and can figure out what to do.

> **CHIEF JUSTICE:** Mr. Marshall, [Marshall inaudibly interrupts Chief Justice] Mr. Marshall. I don't think you're listening. You can present to the Court. I made that clear. But your presentation to the Court will be made under oath because you are not currently a licensed lawyer. But you can make the presentation, it just has to be under oath.

> **MARSHALL:** Will it be subject to cross-examination, rebuttal, or any of the usual evidentiary safeguards?

> **CHIEF JUSTICE:** No sir . . . , you are presumably going to contest factual allegations. You are either representing yourself, which I don't believe is true because Mr. Baker has not withdrawn, [or] just like any other client who would make [a] presentation to the Court, it would be done under oath because we don't have your license to control your behavior. Control is probably too harsh a word. But Mr. Baker as an officer of the Court has a license that requires him . . . to proceed in a certain manner, and an oath requires you to proceed in a certain manner. So, if you would like to make the argument before the Court today, that is fine, but it will be under oath. If you decline to be put under oath, Mr.

Baker will be making the argument to the Court. That is the choice before you.

**MARSHALL:** Justice, let me point out the obvious due process and confrontation problems involved in this procedure where you say they won't be subject to the rules of civil procedure, or rebuttal, uh, or by the way, witnesses. I would note for the record . . .

**CHIEF JUSTICE:** Mr. Marshall, Mr. Marshall. If you are going to make arguments before the Court, it will be under oath, and I am prepared to put you under oath, and then when it's your turn, you can make whatever argument you'd like to the Court subject to the clock running twenty minutes.

**CHIEF JUSTICE:** So, if you want to say anything else to the Court right now, anything at all, it needs to be done under oath. Are you consenting to be put under oath, Mr. Marshall?

**MARSHALL:** Justice, no. I'm reserving my objections to this procedure, this snap procedure, for federal court. And rather than . . .

**CHIEF JUSTICE:** [Marshall inaudibly attempts to talk over Chief Justice] Mr. Marshall, all I needed was a no, you are not, you cannot continue to argue your case without being put under oath. Mr. Baker . . . [Marshall inaudibly interrupts Chief Justice.]

**CHIEF JUSTICE:** Mr. Baker . . . [Marshall inaudibly interrupts Chief Justice.]

**CHIEF JUSTICE:** Mr. Marshall, I'm gonna to ask you to stop. Mr. Baker, will you please say something [so] that you occupy our [Marshall attempts to interrupt Chief Justice inaudibly] screen please.

**MARSHALL:** [Marshall interrupts Chief Justice] I do have a due process and first amendment right to speak briefly in my own defense, and I will say the following. Neither I nor Mr. Baker are prepared or able to proceed under the procedures which you just outlined about five minutes ago. And therefore, your honor, I will seek redress in the

6

federal court. I would ask the Court to adjourn the hearing so that we can get meaningful federal court review because this is a violation of due process. It is a violation . . .

**CHIEF JUSTICE:** Mr. Marshall . . .

**MARSHALL:** [Marshall interrupts Chief Justice] Your honor, I'm . . . we will not proceed because we can't proceed given what's happened.

**CHIEF JUSTICE:** Mr. Marshall, the Court is taking a recess.

{8} The Court then took a recess. Upon returning to the hearing, the Court informed Marshall that the Court had muted his microphone due to his behavior, which "was incredibly disruptive and lacked any sense of decorum." The Court then reiterated that Marshall could have given a presentation if he had agreed to do so under oath, that Marshall and Baker were given plentiful due process and notice in this case, and that the parties had every opportunity to adequately prepare for the hearing. Thus, the Court determined that the hearing would proceed. The Court gave Baker an opportunity to speak on behalf of Marshall, but he declined to do so and agreed that the matter would be decided on the briefing. Disciplinary Counsel indicated she would like an opportunity to reply to Marshall's written response to the Motion for Order to Show Cause. Consequently, the Court gave Disciplinary Counsel two options: (1) file a response, or (2) agree that the matter could be decided on the briefing previously filed by the parties. Disciplinary Counsel accepted that

the Court should decide the matter on the briefing. The Court then went into conference.

{9} After conferencing the matter, the Court held Marshall in contempt of Court both for the rule violations alleged by Disciplinary Counsel and for his behavior before the Court during the Show Cause Hearing. The Court announced its decision to the parties in open court. As a remedial sanction, we required Marshall to comply with the provisions of Rule 17-212, as directed by Disciplinary Counsel, within one week of the hearing. The Court added six months to Marshall's indefinite suspension consistent with *In re Salazar*, 2019-NMSC-010, ¶¶ 2, 21, 443 P.3d 555, as a punitive sanction. Further consistent with *Salazar*, *id.* ¶ 45, the Court struck all of the pleadings filed by Marshall in this proceeding because they were not filed by his counsel. Finally, we fined Marshall $2,000 for his conduct before the Court and notified Marshall that he faced consequences including permanent disbarment if he did not comply with the Court's ruling within ten days of the hearing. We discuss the terms of both contempt sanctions in more detail in the following section of this opinion.

**III.   DISCUSSION**

**A.   The Contempt Power of the Court**

{10} "[T]he power to punish for contempt is inherent in the courts and its exercise

is the exercise of the highest form of judicial power." *State ex rel. Bliss v. Greenwood*, 1957-NMSC-071, ¶ 17, 63 N.M. 156, 315 P.2d 223. New Mexico courts possess statutory authority to "preserve order and decorum, and for that purpose to punish contempts by reprimand, arrest, fine or imprisonment, being circumscribed by the usage of the courts of the United States" pursuant to NMSA 1978, Section 34-1-2 (1851). In fulfilling this mandate, courts are vested with the "power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Anderson v. Dunn*, 19 U.S. 204, 227 (1821). Further, a court's authority to compel orderliness and compliance exists even in the absence of express statutory authority. *Id.* Therefore, while a state legislature may institute reasonable regulatory measures, it may not "substantially impair or destroy the implied power of the court to punish for contempt." *Greenwood*, 1957-NMSC-071, ¶ 18.

**B.      Categories of Contempt**

{11}      Contempts of court are classified as civil or criminal and direct or indirect. *Concha v. Sanchez*, 2011-NMSC-031, ¶ 24, 150 N.M. 268, 258 P.3d 1060. "The major factor in determining whether a contempt is civil or criminal is the purpose for which the power is exercised." *Id.* (internal quotation marks and citation omitted). However, we have noted that "[c]ontempts are frequently neither completely civil nor strictly criminal." *State v. Pothier*, 1986-NMSC-039, ¶ 4, 104

9

N.M. 363, 721 P.2d 1294. "In either event, a defendant has disobeyed an order from the court and is therefore punished." *Id.* "It is not the fact of punishment, but rather its character and purpose, that often serve to distinguish between the two classes of cases." *Jencks v. Goforth*, 1953-NMSC-090, ¶ 20, 57 N.M. 627, 261 P.2d 655 (internal quotation marks and citation omitted). "If it is for civil contempt, the punishment is remedial to coerce [a] defendant to perform the act ordered by the court. But if it is for criminal contempt, the sentence is punitive; to vindicate the authority of the court." *Pothier*, 1986-NMSC-039, ¶ 4.

{12} "Civil contempts are remedial and may use fines, imprisonment, or other sanctions as coercive measures to compel the contemnor to comply in the future with an order of the court." *Sanchez*, 2011-NMSC-031, ¶ 25. Because civil contempt sanctions are not punitive in nature, once the contemnor complies, the sanctions end. *Id.* Thus, "[a] civil contempt defendant carries the keys of his prison in his own pocket. He can end the sentence and discharge himself of contempt at any moment by doing what he has previously refused to do." *Id.* (internal quotation marks and citation omitted).

{13} On the other hand, "[c]riminal contempt proceedings are instituted to punish completed acts of disobedience that have threatened the authority and dignity of the court and are appropriate even after the contemnor is no longer acting

contemptuously." *Id.* ¶ 26. This Court and the United States Supreme Court identify criminal contempt as a "'crime in the ordinary sense; it is a violation of the law.'" *Id.* (quoting *Pothier*, 1986-NMSC-039, ¶ 11 (quoting *Bloom v. Illinois*, 391 U.S. 194, 201 (1968)). "A criminal contempt defendant is therefore entitled to due process protections of the criminal law, the specific nature of which will depend on whether the criminal contempt is categorized as direct or indirect." *Sanchez*, 2011-NMSC-031, ¶ 26.

{14} "*Direct contempt* is contemptuous conduct in the presence of the court, and *indirect contempt* is an act committed outside the presence of the court." *Pothier*, 1986-NMSC-039, ¶ 8. "[D]irect contempts in the presence of the court traditionally have been subject to summary adjudication, to maintain order in the courtroom." *Int'l Union, United Mineworkers of Am. v. Bagwell*, 512 U.S. 821, 832 (1994) (internal quotation marks and citation omitted). Conversely, "[w]hen the judge has not personally witnessed the defendant's contemptuous behavior in the course of a court proceeding, the contempt is classified as indirect criminal contempt and must be resolved through more traditional due process procedures." *Sanchez,* 2011-NMSC-031, ¶ 28.

{15} We acknowledge that the classifications of contempt charges as "civil" or criminal" are somewhat paradoxical as these classifications do not relate to the

underlying charges in the proceedings or the type of court in which the contempt occurs. Instead, as stated above, the classifications relate to the "character and purpose" of the contempt, either remedial or punitive. *Goforth*, 1953-NMSC-090, ¶ 20 (internal quotation marks and citation omitted). Therefore, going forward, to depict the nature of contempt charges more accurately, we advise that "civil" contempt should more precisely be referred to as "remedial" contempt, and "criminal" contempt should be referred to as "punitive" contempt. *See, e.g.*, Colo. R. Civ. P. 107(a)(4)-(5) (classifying contempt sanctions as "punitive" and "remedial" rather than "criminal" and "civil").

## C.    Indirect Contemptuous Conduct

{16}    The facts giving rise to Disciplinary Counsel's Motion for Order to Show Cause were not contested in Marshall's pleadings and remained uncontested before this Court. Accordingly, we announced our decision to hold Marshall in contempt of Court to the parties at the Show Cause Hearing. We concluded that Disciplinary Counsel presented clear evidence to the Court that Marshall violated Rule 17-212(A) and (B) and this Court's order of suspension. The affidavit Marshall filed in rebuttal fell far short of that which is required by Rule 17-212(A) and (B). We explained to the parties at the hearing that Marshall received notice of the allegations of disobedient conduct that gave rise to our holding of contempt. Further, we "set a

12

hearing sufficiently far in advance for the parties to prepare." Thus, it was "clear to the Court from both the pleadings and the proceedings before the Court . . . that . . . Marshall clearly knew of the duties imposed by the Court's order and of the rules that are laid out in Rule 17-212."

{17}    We recognized that "Marshall had the ability to comply with both the Court's order and the rule," yet he failed to do so. In addition, we considered Marshall's conduct to be "willful," even though willfulness is not a requirement for contempt. Marshall's contempt for violation of Rule 17-212 of the Court's order of suspension was indirect. *See Sanchez,* 2011-NMSC-031, ¶ 28. The purpose of this finding of indirect contempt was both remedial and punitive. Our remedial sanction required Marshall to comply with the provisions of Rule 17-212, as instructed by Disciplinary Counsel, within one week of the Show Cause Hearing. Holding that it was not appropriate for Marshall to pay fines to the "damaged party," the public in this case, the Court further added six months to Marshall's indefinite suspension consistent with *In re Salazar*, 2019-NMSC-010, ¶¶ 2, 21, as a punitive sanction of his indirect contempt. Also consistent with *In re Salazar*, *id.* ¶ 45, we struck all of the pleadings filed by Marshall in this proceeding as they were not filed by his counsel.

**D.    Direct Contemptuous Conduct**

13

{**18**}     There was "no question that . . . Marshall's conduct before the New Mexico Supreme Court . . . was contemptuous. In fact, it was aggressive and outrageous." Thus, the Court penalized Marshall's direct contempt of Court, as his behavior "was inconsistent with any sense of decorum before a tribunal in the State of New Mexico." *See Sanchez,* 2011-NMSC-031, ¶ 27. We fined Marshall $2,000 as a punitive sanction of his direct contempt by continual interruption of the Court and disregard of the Court's instructions. Moreover, we informed Marshall that if he did not timely pay the fee to the Client Protection Fund, there would be additional contempt proceedings forthcoming, which could include "a penalty up to and or including permanent disbarment." We hold that this punishment is appropriate in light of Marshall's conduct before the Court.

{**19**}     This Court acknowledges that our prior precedent set in *Seven Rivers*, 1973-NMSC-039, ¶ 42, imposes a $1,000 limit for punitive contempt fines absent a trial by jury. Going forward, we clarify that this limit no longer exists for contempt charges. Some states have statutory limits imposing a maximum penalty for contempt of court of $5,000.[1] Our Legislature has not used its regulatory authority

---

[1]S.D. Codified Laws § 21-34-6 (2023) (allowing for a maximum fine of $5,000); Wis. Stat. Ann. § 785.04(2) (2021) (same); Wash. RCW 7.21.040(5) (2011) (same).

to fix a maximum monetary penalty for punitive contempt. However, our Court established a $1,000 maximum penalty for punitive contempt fines in *Seven Rivers*, 1973-NMSC-039, ¶ 42. Even so, this Court acknowledged in *Seven Rivers* that "where . . . the sole punishment of the criminal [or punitive] contemnor is a fine we are free to make our own determination as to what is a 'petty' and what is a 'serious' offense." *Id*. Additionally, we remarked that "a fine which might once have been considered severe or burdensome, such as $1,000[], might now be felt to be mild. We do not consider the fine imposed here to be very substantial or burdensome." *Id*. ¶ 37. It is important to view this statement in the context of when *Seven Rivers* was decided—1973.

{20}    A fine of $1,000 in 1973 is approximately equivalent to $6,705.20 in 2022 and $6,738.06 in 2023. *See* CPI Inflation Calculator, available at https://www.officialdata.org/us/inflation/1973?amount=1000 (last visited Mar. 10, 2023). It follows that the classification of a $1,000 fine as a "serious" offense invoking the right by jury trial in 1973 cannot stand nearly thirty years later for direct punitive contempt. This is especially the case where, as here, the contemptuous conduct occurred in front of the Court, generally omitting the need for a fact-finding process. *Bagwell*, 512 U.S. at 832. We decline to place an express limit on contempt fines today. Instead, we adhere to New Mexico precedent and federal precedent

15

granting courts the power to determine whether an offense is serious under the circumstances of the case.

{21} Our conclusion here is in accord with United States Supreme Court precedent, which has provided that limits on punishment for contempt and whether a right to trial by jury is implicated depend on whether a contempt offense is classified as "petty" or "serious." *Bloom*, 391 U.S. at 198. The United States Supreme Court has accepted the view that "criminal [or punitive] contempt is a petty offense unless the punishment makes it a serious one." *Id.* The Court provides that "dispensing with the jury in the trial of contempts subjected to severe punishment represents an unacceptable construction of the Constitution . . . ." *Id.* Furthermore, "when the legislature has not expressed a judgment as to the seriousness of an offense by fixing a maximum penalty which may be imposed, we are to look to the penalty actually imposed as the best evidence of the seriousness of the offense." *Id.* at 211.

{22} Rule 42(b) of the Federal Rules of Criminal Procedure provides that "the court (other than a magistrate judge) may summarily punish a person who commits criminal [or punitive] contempt in its presence if the judge saw or heard the contemptuous conduct and so certifies . . . ." Remarking on this principle, the United States Supreme Court stated, "This rule reflects the common-law rule which is

16

widely if not uniformly followed in the States." *Bloom*, 391 U.S. at 209.[2] New Mexico is one of the states that historically has followed this approach. *See, e.g.*, Rule 2-110(B)(2), (C) NMRA (2016); Rule 3-110(B)(2), (C) NMRA (2016); Rule 5-112(B)(2), (C) NMRA (2016); Rule 8-110(B)(2), (C) NMRA (2016). It is important to note that the United States Supreme Court has not expressly created an exception to the constitutional right to jury trials in direct punitive contempt cases but has clarified, "It is old law that the guarantees of jury trial . . . do not apply to petty offenses." *Bloom*, 391 U.S. at 210. In doing so, the United States Supreme Court seemingly classifies contemptuous conduct occurring before a court as a "petty" offense, absent a severe punishment. *See id.* (recognizing "a strong temptation to make exception to the rule we establish today for disorders in the court room" but deciding that "no special rule is needed" because the right to a jury trial "do[es] not apply to petty offenses"). The United States Supreme Court has deemed imprisonment exceeding six months a "serious" contempt punishment. *Bagwell*, 512 U.S. at 826-27. There is no analogous limit placed on a punitive contempt fine.

---

[2]*Bloom*, 391 U.S. at 209, quoted historical Rule 42(a), which at the time provided that "'criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court.'" This principle is reflected in what is now Rule 42(b).

## IV.    CONCLUSION

{23}    Contempt charges formerly classified as either "civil" or "criminal" should instead be regarded as "remedial" or "punitive" to more accurately reflect the distinctions between the different types of contempt. Marshall faced both remedial and punitive contempt sanctions as a result of both his indirect contemptuous conduct and his direct contemptuous conduct exhibited at the Show Cause Hearing. To the extent that our precedent instructs a $1,000 maximum for direct, punitive contempt fines absent a jury trial, we hold that this mandate no longer stands.

{24}    **IT IS SO ORDERED.**

_____
**C. SHANNON BACON, Chief Justice**

_____
**MICHAEL E. VIGIL, Justice**

_____
**DAVID K. THOMSON, Justice**

_____
**JULIE J. VARGAS, Justice**

_____
**BRIANA H. ZAMORA, Justice**